UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.:** _____ |
| | : | |
| v. | : | Violations: |
| | : | |
| **MIN JUNG CHO,** | : | **18 U.S.C. § 371 (Conspiracy to Commit** |
| | : | **Bribery of a Public Official)** |
| **Defendant.** | : | |
| | : | **18 U.S.C. § 981(a)(1)(C);** |
| | : | **28 U.S.C. § 2461 (Criminal Forfeiture)** |

# I N F O R M A T I O N

The United States Attorney charges:

### Relevant Entities and Individuals

1. From in or about January 2007 through the present, the defendant, MIN JUNG CHO ("MIN CHO"), was the President and sole owner of Nova Datacom, LLC ("Nova Datacom").

2. Nova Datacom was a Virginia limited liability corporation formed on or about February 5, 2004. In September 2007, Nova Datacom was certified by the U.S. Small Business Administration as an 8(a) small disadvantaged business. Nova Datacom provided information assurance and security services to commercial companies and federal departments and agencies, including the United States Army Corps of Engineers and the United States Army. Nova Datacom maintained its corporate headquarters in Sterling, Virginia and, later, in Chantilly, Virginia.

3. YOUNG N. CHO, also known as ALEX N. CHO ("ALEX CHO"), was the Chief Technology Officer of Nova Datacom. MIN CHO was ALEX CHO's sister.

4. NICK PARK, a/k/a NOCHOL PARK ("PARK"), was an agent of Nova Datacom.

5. From in or about September 2007 through December 30, 2010, THEODOROS N. HALLAS ("HALLAS") was the Executive Vice President of Nova Datacom.

6. The United States Army Corps of Engineers ("USACE") was a branch of the United States Army made up of approximately 34,000 civilian and military personnel. The Headquarters for the USACE was located at 441 G Street, N.W., in the District of Columbia. The USACE's stated mission was to "provide vital public engineering services in peace and war to strengthen our Nation's security, energize the economy, and reduce risks from disasters." The Directorate of Contingency Operations ("DCO") was a branch of the USACE. The USACE administered the Technology for Infrastructure, Geospatial, and Environmental Requirements ("TIGER") Contract.

7. The TIGER Contract was a vehicle that authorized federal government agencies and departments used to purchase products and services. The TIGER Contract was an audited and awarded Indefinite Delivery/Indefinite Quantity ("IDIQ") contract. As a result, such authorized agencies and departments were not required to obtain three separate bids or to compare the TIGER Contract to another contract before submitting an invoice for products and services through the TIGER Contract. The current TIGER Contract was a five-year contract running from October 1, 2009 through September 30, 2014. Over that term, the total award of orders placed against the TIGER Contract was authorized to exceed $1,000,000,000.

8. Until October 4, 2011, MICHAEL A. ALEXANDER ("ALEXANDER") was a Program Manager with the USACE's DCO at Headquarters in Washington, D.C. ALEXANDER was involved in, among other things, placing orders for the DCO through federal government contracts, including the TIGER Contract.

9. Until October 4, 2011, KERRY F. KHAN ("KHAN") was a Program Director with the USACE's DCO at Headquarters in Washington, D.C. KHAN was responsible for, among other

things, obtaining funding for USACE orders placed through federal government contracts, including the TIGER Contract.

10. Adrasteak Insurance Corporation was a registered corporate entity in Anguilla. KHAN controlled Adrasteak Insurance Corporation.

11. Ananke, LLC ("Ananke") was a Virginia limited liability company. KHAN controlled Ananke.

12. Eyak Technology LLC ("EyakTek") was an Alaska Native Corporation with an office in Dulles, Virginia. EyakTek was the prime contractor for the TIGER Contract.

13. Until October 4, 2011, HAROLD F. BABB ("BABB") was the Director of Contracts at EyakTek.

14. The United States Army's Program Executive Office Enterprise Information Systems ("PEO EIS") was a bureau with the Department of the Army that provided infrastructure and information management systems to the Army. The Project Manager, Defense Communications and Army Transmission Systems ("PM DCATS"), was a division of PEO EIS.

15. Until April 27, 2012, Public Official C was an Assistant Project Manager for PM DCATS. While employed at PM DCATS, Public Official C was a public official. Until in or about May 2010, Public Official C resided and worked in Seoul, South Korea. During that time period, Public Official C was the Contracting Officer Technical Representative ("COTR") for a prime contract with the Eighth Army, prime contract W15P7T-06-D-E407 (the "Prime Contract"). Beginning in or about May 2010, Public Official C resided in Fairfax Station, Virginia, and worked at Fort Belvoir, Virginia. Public Official C became a public official in or about July 1990.

16. OH SUNG KWON, a/k/a THOMAS KWON ("KWON"), was the co-founder and Chief Financial Officer of Avenciatech, Inc. ("Avenciatech"). KWON controlled Avenciatech, Inc. Avenciatech maintained its corporate headquarters in Annandale, Virginia. Since in or about October 2009, Avenciatech was a government contractor.

17. Co-Conspirator 5 ("CC-5") was the owner of a real estate title company with an office in Annandale, Virginia.

### The Bribery Schemes and the Attempted Cover Up

18. ALEX CHO, PARK, and MIN CHO obtained government contracts for Nova Datacom by making bribe payments to KHAN and ALEXANDER. ALEX CHO, with MIN CHO's knowledge, also obtained government contracts for Nova Datacom by paying kickbacks to BABB.

19. To make some of the cash payments to KHAN, ALEX CHO and MIN CHO used an intermediary, CC-5, to obtain the cash to pay to KHAN. KWON introduced ALEX CHO and MIN CHO to CC-5. CC-5 arranged for ALEX CHO and MIN CHO to provide checks to CC-5's contacts in exchange for cash. MIN CHO knew that some portion of the cash obtained through CC-5 was intended to be given to KHAN in exchange for KHAN's efforts to steer government contracts to Nova Datacom.

20. MIN CHO also knew from discussions with ALEX CHO that ALEX CHO and PARK paid bribes to Public Official C in exchange for Public Official C's efforts to steer government contracts to Nova Datacom.

21. MIN CHO learned from discussions with KWON that KWON obtained government contracts for Avenciatech.

22. In or about November 2010, MIN CHO and ALEX CHO learned that HALLAS was under federal criminal investigation for submitting false past performance references to federal agencies to obtain government contracts for Nova Datacom. In or about February 2011, KWON learned through discussions with ALEX CHO and MIN CHO that HALLAS was under criminal investigation.

23. In or about February 2011, MIN CHO, ALEX CHO, and KWON met to discuss the criminal investigation. MIN CHO and KWON were aware that ALEX CHO intended to cooperate in the criminal investigation and to voluntarily disclose certain information to the criminal investigators. ALEX CHO, MIN CHO, and KWON were worried that the criminal investigation would lead to the discovery of the bribe payments to Public Official C and the involvement of CC-5 in assisting Nova Datacom to make some of the bribe payments to KHAN.

24. On March 3, 2011, ALEX CHO began to cooperate with the criminal investigators.

25. MIN CHO learned from discussions with ALEX CHO and KWON that ALEX CHO intended to withhold certain information from the criminal investigators about KHAN, ALEXANDER, PARK, and Public Official C in an attempt to keep the investigation from leading to KWON, MIN CHO, and others. In MIN CHO's presence, KWON physically broke a computer hard drive in an attempt to destroy evidence concerning the investigation.

26. Through June 2011, ALEX CHO, KWON, and MIN CHO met following ALEX CHO's debriefings with the criminal investigators to discuss the information disclosed by ALEX CHO and the direction of the criminal investigation. KWON and MIN CHO learned from those meetings that ALEX CHO provided false information to the criminal investigators to protect KWON, MIN CHO, and others.

27.     On or about June 22, 2011, ALEX CHO told MIN CHO that ALEX CHO had informed the criminal investigators of the past efforts by ALEX CHO, MIN CHO, and KWON to obstruct the criminal investigation. As of that date, MIN CHO began to cooperate with the criminal investigators. Nova Datacom began cooperating with criminal investigators prior to this date and continued cooperation after this date.

## COUNT ONE
### (Conspiracy to Commit Bribery of a Public Official)

28.     Paragraphs 1 through 27 of this Information are realleged and incorporated by reference as if set out in full.

29.     From in or about July 2007 through in or about October 2011, in the District of Columbia and elsewhere, the defendant, MIN CHO, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States and to defraud the United States and agencies thereof, that is, directly and indirectly, corruptly gave, offered, and promised things of value to public officials, namely KHAN, ALEXANDER, and Public Official C, and corruptly gave, offered, and promised things of value to such public officials personally and to other persons and entities as directed by such public officials, with the intent to influence official acts, to influence such public officials to commit and aid in committing, collude in, and allow fraud, and make opportunity for the commission of fraud on the United States, and to induce such public officials to do and omit to do acts in violation of the lawful duty of such public officials, in violation of Title 18, United States Code, Section 201(b)(1).

### Goal of the Conspiracy

30. It was a goal of the conspiracy that the defendant, MIN CHO, and others would and did enrich themselves by giving, offering, and promising to give things of value to public officials in exchange for the award of government contracts to Nova Datacom by the USACE and the Army.

### Means and Methods of the Conspiracy

31. Among the means and methods by which the defendant, MIN CHO, and her co-conspirators would and did carry out the conspiracy were the following:

   a. MIN CHO and ALEX CHO gave, offered, and promised, and caused Nova Datacom and others to give, offer, and promise, things of value to KHAN and ALEXANDER in exchange for KHAN and ALEXANDER using their positions as public officials to cause the USACE to direct government contracts to Nova Datacom through the TIGER Contract.

   b. ALEX CHO, with MIN CHO's knowledge, gave, offered, and promised, and caused Nova Datacom and others to give, offer, and promise, kickbacks, that is, money, gifts, and things of value, as compensation for BABB providing favorable treatment to Nova Datacom in connection with subcontracts between Nova Datacom and EyakTek.

   c. ALEX CHO gave, offered, and promised, and caused Nova Datacom and others to give, offer, and promise, things of value to Public Official C in exchange for Public Official C using Public Official C's position as a public official to cause the Army to direct government contracts to Nova Datacom.

   d. ALEX CHO, MIN CHO, and KWON agreed to obstruct the federal criminal investigation of Nova Datacom to avoid detection by the investigators concerning the actual and full

scope of the involvement of ALEX CHO, MIN CHO, KWON, CC-5, and others in the schemes to pay bribes to KHAN, ALEXANDER, and Public Official C.

## Overt Acts

32. In furtherance of the conspiracy, and to effect the illegal objects thereof, the defendant, MIN CHO, and her co-conspirators committed the following overt acts, among others, in the District of Columbia and elsewhere:

    a. On or about December 23, 2008, MIN CHO caused Nova Datacom to wire $1,000,000 to a diversified company in South Korea to purchase two coffee shops in Seoul, South Korea. MIN CHO and ALEX CHO caused Nova Datacom to spend approximately $800,000 of the $1,000,000 wire transfer to lease and improve the leased space for a coffee shop, called Seven Monkeys, which was located in a wealthy area in Seoul, South Korea, for the benefit of ALEXANDER's associate. MIN CHO and ALEX CHO used approximately $200,000 of the $1,000,000 wire transfer to lease a second coffee shop, called Zoo Coffee Shop, which was located in a wealthy area in Seoul, South Korea, for the intended benefit of Nova Datacom and an agent of Nova Datacom.

    b. On or about December 9, 2009, MIN CHO caused Nova Datacom to issue a check for $3,332,351.65 to Adrasteak Insurance Corporation for the benefit of KHAN.

    c. On or about February 8, 2010, Adrasteak Insurance Corporation issued a check for $3,342,815.97 payable to Nova Datacom.

    d. On or about February 21, 2010, MIN CHO caused Nova Datacom to issue a check for $3,342,815.97 payable to Ananke for the benefit of KHAN.

e. In or about December 2010, MIN CHO caused Nova Datacom to pay $2,000,000 to MIN CHO in the form of a "bonus," but which, in fact, MIN CHO had agreed to hold for KHAN and to pay to KHAN after KHAN retired from the USACE.

**(Conspiracy, in violation of Title 18, United States Code, Section 371.)**

## CRIMINAL FORFEITURE ALLEGATION

1. The allegations set forth in Count One of this Information are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. As a result of the offense alleged in Count One of this Information, the defendant shall forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation alleged in Count One, including, but not limited to:

### Money Judgment

$6,884,948.16 which represents a sum of money equal to the value of the property which constitutes or is derived from proceeds traceable to the violation alleged in Count One.

3. By virtue of the commission of the felony offense charged in Count One of this Information, any and all interest that the defendant has in any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

4. If, as a result of any act or omission of the defendant, the property described above:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the said defendant up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, in violation of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c)).**

RONALD C. MACHEN JR.
United States Attorney
In and For the District of Columbia

By: _____
MICHAEL K. ATKINSON
D.C. Bar No. 430517
JAMES E. SMITH
ANTHONY SALER
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7817 (Atkinson)
(202) 252-6976 (Smith)
Michael.Atkinson2@usdoj.gov
James.Smith9@usdoj.gov

DATED: March 14, 2013